IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No.: 5:18-cv-197

| | | |
|---|---|---|
| EPIC GAMES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| THOMAS HANNAH, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

Plaintiff, Epic Games, Inc. ("Epic" or "Plaintiff") complains of Defendant Thomas Hannah ("Hannah" or "Defendant"), as follows:

## NATURE OF ACTION

1.      This is a civil action seeking injunctive relief and damages against Defendant for (i) misappropriation of trade secrets in violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1836, *et seq.* (the "DTSA"); (ii) misappropriation of trade secrets in violation of the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. §§ 66-152, *et seq.* (the "NCTSPA"); (iii) common law civil conspiracy; and (iv) breach of contract in violation of North Carolina law.

2.      Trade secrets are a form of intellectual property that provides legal protection for commercially valuable confidential information that: (a) has been the subject of reasonable efforts to maintain its secrecy and (b) derives independent economic value from not being generally known or readily ascertainable. Both the federal DTSA and the State NCTSPA protect trade secrets from "misappropriation" which is the unauthorized acquisition, use, or disclosure of a trade secret.

3. One way trade secret owners protect their trade secrets while disclosing them to others is through non-disclosure agreements ("NDAs"). NDAs are contracts that allow trade secret owners to entrust others with confidential and proprietary information, including trade secrets, while maintaining the security and integrity of the information and the confidence that neither its secrecy nor its value will be compromised or destroyed because it was shared. Sharing protected information in this way encourages and promotes collaboration, experimentation, and the continued development and improvement of the protected material.

4. This is a breach of contract and misappropriation of trade secrets action in which Defendant, working in concert with at least one other person, leaked valuable Epic trade secrets about upcoming seasons of Epic's video game, Fortnite®. In so doing, Defendant "spoiled" some of Epic's closely-guarded trade secrets with which Defendant had been entrusted while working as a contractor at Epic.

5. In disclosing these trade secrets, Defendant breached his contractual obligation to maintain them in confidence and betrayed the trust of the people at Epic with whom he worked.

6. He also diminished the enjoyment of the people who play, or who watch others play, Fortnite by ruining the suspense that had been building in the Fortnite community in anticipation of upcoming season. Helping to create this anticipation and excitement was Epic's goal. It was the result of considerable planning, creativity, and hard work by Epic's employees who leave hints and hide "Easter eggs" in the game, and publish "teasers" and "trailers" outside of it-- all so Fortnite fans remain engaged in and enthusiastic about the game.

7. Defendant's conduct is damaging to Epic in many ways. Just as leaked trade secrets generate significant traffic and revenue to the benefit of those who publish them, those leaks are destructive to the owner of the leaked material.

PPAB 4242533v1

8.      Unauthorized disclosure of trade secrets undermines the incentive to create and innovate because it demoralizes those who may work on a game over many months, only to have the fruits of their labor soured or spoiled by someone they held in a position of trust.

9.      Leaks also dampen the enthusiasm of a game's players and audience, potentially leading them to move to other games, and negatively impact the financial performance of current and future versions of the game.

10.     Defendant's conduct constitutes misappropriation of Epic's trade secrets and breach of the terms of the non-disclosure agreement to which Defendant agreed in order to have access to the trade secrets he took and conspired to publicly disclose, damaging Epic and detracting from the enjoyment of Fortnite's players and fans.

## THE PARTIES

11.     Epic is a corporation duly organized and existing under the laws of the State of Maryland. Epic is registered to do business in North Carolina and has its principal place of business in Wake County, North Carolina.

12.     On information and belief, Defendant Thomas Hannah is a citizen and resident of Raleigh, North Carolina.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of Plaintiff's federal claims under 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c) because this action arises under the DTSA, 18 U.S.C. §§ 1832, *et seq*. This Court has supplemental jurisdiction over Plaintiff's related state law claims under 28 U.S.C. § 1367(a).

14.     This Court has personal jurisdiction over Defendant because, as described below, Defendant consented to jurisdiction in this District. This Court also has personal jurisdiction over Defendant because Defendant resides in this District and has purposefully availed himself of the

privileges of conducting activities and doing business in the State of North Carolina and in this District, by living and working here, thus invoking the benefits and protections of North Carolina's laws.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because this is a District in which a substantial part of the events giving rise to Plaintiff's claims occurred, in which Defendant currently resides, and where he committed acts of trade secret misappropriation and breached his contract, which was entered into in this District and is governed by North Carolina law, and/or where Plaintiff's injuries were suffered.

## FACTS APPLICABLE TO ALL CLAIMS

### *Epic and Fortnite*

16.     Founded in 1991, Epic is a Cary, North Carolina-based developer and publisher of computer games, game engine software, and content creation software. Epic is recognized worldwide as the creator of the Unreal®, Gears of War®, and Infinity Blade® series of games.[1] Epic is perhaps best known as the creator, developer, and publisher of Fortnite.

17.     Fortnite is a co-op survival and building action game in which players may join together online to build forts, weapons, and traps in an effort to rebuild and defend towns left vacant in the wake of "the Storm" from the monsters that populate the Fortnite world.

18.     Fortnite was broadly released on July 25, 2017. Fortnite's free-to-play "Battle Royale" game mode was released on September 26, 2017.

19.     Since that time, Fortnite has become extremely popular in the United States and across the globe. It has tens of millions of players and is Epic's most successful game yet. (A true and correct screen print from the Fortnite page on Epic's website [available at:

---

[1] The trademark registration symbol is used the first time each registered mark is used herein but not again after that.

http://www.epicgames.com/fortnite/en-US/home] which provides a glimpse into Fortnite's cartoonish world is pictured below in **Figure 1**):



(*Figure 1.*)

20.     Like other games in the battle royale genre, Fortnite Battle Royale involves dropping (in Fortnite, by glider from a flying "battle bus,") a limited number of players into a large map. Fortnite Battle Royale combines Fortnite's building skills and destructible environments with intense player vs. player combat. Players battle each other until only one player remains standing. That player wins the game.

21.     The widespread enthusiasm Fortnite enjoys is due in part to the goodwill and reputation for quality that Epic built up in and around the game. Epic has worked very hard to create and continually improve Fortnite by making it, and the experience of those who play and watch it, as exciting as possible.

5

22.     An important part of this work, and of Fortnite's dramatic success, is the unexpected changes and surprises Fortnite's fans experience as the game, its story, and its environment continually evolve. This, along with the regular introduction of new content, including, without limitation, planned events, playing formats, themes, narratives, storylines, plot twists and developments, characters, player capabilities, "emotes" (i.e., dances or gestures a player's avatar can perform), cosmetics (e.g., "skins" for player avatars), weapons, "Easter eggs," changes to the Fortnite map and environment, and other secrets and surprises have kept Fortnite's millions of registered users excited about, and engaged with, the game while its fan base has continued to expand.

### *Epic's Trade Secrets in Fortnite*

23.     Epic is the owner of all rights, title and interest in and to the Fortnite-related trade secrets at issue in this case, including, without limitation, proprietary and confidential business and technical information concerning planned events, playing formats, themes, narratives, storylines, plot twists and developments, characters, player capabilities, "emotes" (i.e., dances or gestures a player's avatar can perform), cosmetics (e.g., "skins" for player avatars), weapons, "Easter eggs," changes to the Fortnite map and environment, and other secrets and surprises (collectively, "Epic Trade Secrets" or "Epic's Trade Secrets").

24.     Epic's Trade Secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of Epic's Trade Secrets.

25.     Epic's Trade Secrets are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

6

26.     At all relevant times, Epic has taken reasonable measures to keep Epic's Trade Secrets secret by, including, without limitation: (i) maintaining them in secure working spaces; (ii) requiring a fully executed NDA for every person who might have access to Epic's Trade Secrets; (iii) limiting access to Epic's Trade Secrets to only those who are working on Fortnite or are part of senior management; and (iv) requiring (a) an assigned Epic user name, (b) password (with leading-edge industry standards for password requirements), and (c) multifactor authentication to access the computer system in which Epic's Trade Secret-related files are stored and/or live-streamed meetings during which Epic's Trade Secrets might be discussed or disclosed.

### *Defendant's NDA*

27.     Defendant was a contractor hired to work at Epic by Volt Workforce Solutions, a company that facilitates contingent staffing.

28.     Defendant began his engagement at Epic on December 4, 2017 as a quality assurance tester for Fortnite. He was permitted access to not-yet-released versions of the game in order to generate bug reports, build stability reports, and generate feedback and data for Epic's Fortnite developers.

29.     Because his work required access to Epic's confidential and proprietary information and trade secrets, Defendants was required to sign, and did sign, an NDA contemporaneously with the commencement of his engagement at Epic.

30.     Specifically, Defendant entered into a Temporary Personnel Nondisclosure Agreement dated November 27, 2017 (the "NDA"), in which Defendant acknowledged that during his time at Epic he might "learn certain information about Epic and its business," which information Epic desired to protect. (NDA at page 1.) (A true and correct copy of the executed NDA is attached hereto as **Exhibit A**.)

31.     Under the NDA, Defendant agreed that Epic would provide him with "certain information that is confidential, proprietary, and not generally available to the public ("Confidential Information"), and agreed that this "Confidential Information provided by Epic was developed through substantial expenditures of time, effort, and money and constitutes valuable and unique property of Epic." (NDA at § 2.)

32.     Defendant further agreed to: "keep in strict confidence and … not directly or indirectly disclose, furnish, disseminate, make available, or, except in the course of [his work at Epic], use any Confidential Information." (NDA at § 3.)

33.     Defendant agreed and acknowledged:

> that **all such Confidential Information**, whether reduced to writing, electronic media of any form, or maintained in the mind or memory … derives independent economic value from not being readily known to or as ascertainable by proper means by others who can obtain economic value from its disclosure or use, that reasonable efforts have been made by Epic to maintain the secrecy of such information, **that such information is the sole property of Epic, and that any use of such information by [Defendant]** … after Epic requests the return of such information **shall constitute the misappropriation of Epic's trade secrets**.

(NDA at § 3) (emphasis added.)

34.     In Section 12 of the NDA, Defendant further agreed that Epic:

> "**shall be entitled to injunctive relief** without the posting of any bond or other security, **in addition to whatever other remedies it might have**, at law or equity, in any court of competent jurisdiction against any acts of noncompliance by the breaching party under this agreement.

(NDA at § 12) (emphasis added.)

35.     The NDA also provides that the courts of competent jurisdiction are in Wake County, North Carolina and that North Carolina law governs the NDA.

36.     The NDA is a valid and binding agreement between Epic and Defendant.

37.     Epic has performed all of its obligations under the NDA.

38.     Defendant's conduct described herein breaches the terms of the NDA.

8

39.     As a direct result of Defendant's breaches of the NDA, Epic has been, and will continue to be, harmed by Defendant's bad acts and is entitled to injunctive relief and monetary damages.

### *The Defendant and His Unlawful Acts*

40.     Fortnite is the product of a multidisciplinary team of hundreds of developers, designers, engineers, marketers, and other creative and business people who use art, science, imagination, skill, and hard word to create and continually improve the game. Their primary objective is that Fortnite's players and audience remain engaged and entertained.

41.     Defendant attempted to "give the game away" by leaking Epic's Trade Secrets to a co-conspirator, who published them, ending the suspense and spoiling surprises that had been planned for months by Epic's Fortnite team in the run up to Season 4.

42.     The impact of Defendant's leak was immediate and damaging. The victims of Defendant's leak are many.

43.     Defendant's spoilers detract from the pleasure that Fortnite's players and audience take from the game because they destroy the anticipation of what is to come and the joy of looking forward to it.

44.     The spoilers also deprive Fortnite's players and audience of the thrill that comes from the element of surprise and the delight of experiencing that surprise and the planned "reveal" all together at the same time.

45.     And spoilers can reduce the level of skill required to discover, learn, and ably deploy winning strategies in the game, degrading the level of triumph a player might feel upon being the last one standing and experiencing a "Victory Royale."

46.     Defendant's leak, and the spoilers that spring from it, do what just the word suggests-- they spoil some of the key elements that have led to Fortnite's massive appeal and success.

47.     For instance, for many weeks after telescopes appeared in the game and players discovered they were pointed at a small, bright blue light in the sky, speculation was rampant about whether the light—which grew larger by the day—was an approaching meteor and, if it was, where on the Fortnite map it might strike.

48.     As Season 3 was drawing to a close, most players expected that the meteor would strike "Tilted Towers," one of the most dangerous places on the Fortnite map. But no one outside of Epic knew what the mysterious object in the sky was, if it was even actually a meteor, or when or where it would strike. Stories and discussions about the meteor appeared frequently in all sorts of online forums and press reports. (A true and correct screen print from the website of the UK paper, *The Daily Star*, [available at https://www.dailystar.co.uk/tech/gaming/696838/Fortnite-Tilted-Towers-meteor-UPDATE-50vs50-LTM-Epic-Games-event-delay] which provides an example of a headline capturing this speculation is pictured below in **Figure 2**):





*(Figure 2.)*

49.     Defendant learned answers to these questions and others, all of which were closely guarded trade secrets of Epic, during the time he worked at Epic.

50.     As part of his job, Defendant attended Fortnite team meetings. On March 16, 2018, Defendant attended a livestream of a Fortnite team meeting concerning the development of upcoming seasons of Fortnite. The meeting took place at Epic's main building in Cary and was livestreamed on a secure streaming channel to external offices, including the office where Defendant worked.

51.     Meeting participants were given a specific link and also required to login using their Epic username and password as well as use multi-factor authentication. Invitations to this meeting (and others like it) were sent only to the Fortnite team— not to general Epic personnel.

52.     Epic's Trade Secrets were discussed during the March 16, 2018 meeting and Defendant had access to them as a result.

53.     Defendant resigned from Epic on April 4, 2018.

54.     On April 24, 2018, a Reddit user named "internetadam" posted a message entitled "SPOILERS for Season 4 Battle Pass & Meteor" on a publicly available website.

55.     "internetadam" is Adam DiMarco.

56.     On information and belief, Defendant and DiMarco, working in concert, are responsible for the misappropriation and public disclosure of some of Epic's Trade Secrets.

57.     In the April 24, 2018 post in which he disclosed certain of Epic's Trade Secrets, DiMarco mentioned a source who "refused to be named."

58.     On information and belief, the source referred to in the April 24, 2018 post is Defendant.

59.     In the April 24, 2018 post, DiMarco stated that he would post more "spoilers & predictions ASAP" under the new account "/u/FortniteLeakGod."

11

60.     On April 27, 2018, DiMarco posted an updated version of the April 24 post, in which he disclosed additional Epic Trade Secrets and provided more details about some of the Epic Trade Secrets he had already disclosed. He also stated "I really want my spoiler about Season 5 to happen . . ."

61.     In the course of disclosing these Epic Trade Secrets, which concern specific events, happenings, themes, and outlines of where the Fortnite story, map, and environment will go during Season 4, Defendant explained Epic's rationale for why those things needed to happen, e.g., "Epic has thought . . . . for a long time", "Epic feels like they . . ."

62.     DiMarco's descriptions of Epic's thoughts and feelings, like the distinction he made in his posts between "spoilers" and "predictions," are clear indications that Defendant, who, while working at Epic, had access to Epic's Trade Secrets and the rationale behind them, is the source of the leaks and the resulting spoilers.

63.     On May 1, 2018, a meteor shower marked the end of Season 3 and the beginning of Season 4 of Fortnite. (*See* **Figure 3**, below.)

PPAB 4242533v1



*(Figure 3.)*

64. Consistent with one of the spoilers DiMarco posted based on Defendant's leak, a meteor hit Dusty Depot (now "Dusty Divot") rather than Titled Towers.

65. Defendant disclosed to DiMarco this and other Epic Trade Secrets. DiMarco has disclosed some of them publicly, and has threatened to disclose others.

66. Defendant's disclosure of Epic's Trade Secrets and Confidential Information (as that term is defined in the NDA) constitutes misappropriation of trade secrets in violation of both the NCTSPA and the DTSA, violates the terms of the NDA, and is the result of a civil conspiracy in violation of common law.

67. As a direct result of Defendant's breaches of the NDA and his violations of the NCTSPA and the DTSA, Epic has been, and will continue to be, harmed and is entitled to injunctive relief, compensatory damages, attorneys' fees, costs, and/or other equitable relief against Defendant.

PPAB 4242533v1

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

68.     Epic re-alleges and incorporates fully by references the allegations in paragraphs 1 through 67 of this complaint, as if set forth fully herein.

69.     This is a claim for breach of contract under North Carolina law.

70.     As set forth above, Defendant entered into a binding, valid non-disclosure agreement with Epic, which was supported by adequate consideration, in which he agreed not to disclose Epic's Confidential Information.

71.     Defendant, through his disclosure of Epic's Confidential Information and trade secrets to DiMarco breached the terms of the NDA.

72.     As a direct result of Defendant's breach of his contractual obligations under the NDA, Epic has sustained and will continue to sustain damages in an amount to be determined.

73.     As a result of Defendant's breach of the NDA, Epic has suffered and is continuing to suffer irreparable injury. Epic cannot be adequately compensated for these injuries by monetary awards alone, and Epic has no adequate remedy at law for Defendant's breach. Epic is entitled to injunctive relief against Defendant, and to recover any damages proven to have been caused by reason of Defendant's breach.

## SECOND CLAIM FOR RELIEF
### (Misappropriation of Trade Secrets under N.C. Gen. Stat. § 66-152, *et seq.*)

74.     Epic re-alleges and incorporates fully by reference the allegations in paragraphs 1 through 73 of this complaint, as if set forth fully herein.

75.     This is a claim for misappropriation of trade secrets under the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. §§ 66-153, *et seq.*

76.     Epic is the owner of Epic's Trade Secrets (as defined above), which are "trade secrets" under N.C. Gen. Stat. § 66-152(3) because, as described above, they are business and technical information that:

      a.   at all relevant times has been the subject of reasonable efforts to maintain its secrecy; and

      b.   derives economic value and competitive advantage from not being generally known.

77.     Defendant was given access to Epic's Trade Secrets as part of his job responsibilities.

78.     Defendant knew or should have known that Epic's Trade Secrets were trade secrets of Epic because, among other things, he agreed and acknowledged under the NDA that Epic would provide him with Confidential Information (as defined above), including trade secrets, and that:

> **all such Confidential Information**, whether reduced to writing, electronic media of any form, or maintained in the mind or memory … derives independent economic value from not being readily known to or as ascertainable by proper means by others who can obtain economic value from its disclosure or use, that reasonable efforts have been made by Epic to maintain the secrecy of such information, **that such information is the sole property of Epic, and that any use of such information by [Defendant]** … after Epic requests the return of such information **shall constitute the misappropriation of Epic's trade secrets**.

(NDA at §§ 2-3) (emphasis added).

79.     The NDA makes clear that Defendant is not authorized to disclose Epic's Trade Secrets to any person outside of Epic.

80.     Defendant nevertheless disclosed some or all of Epic's Trade Secrets to DiMarco without Epic's authorization or consent.

15

81.     Defendant's disclosure of some or all of Epic's Trade Secrets to DiMarco without Epic's express or implied authority or consent constitutes misappropriation of Epic's Trade Secrets under N.C. Gen. Stat. § 66-152(1).

82.     Defendant's misappropriation resulted in economic loss to Epic and/or unjust enrichment to Defendant, entitling Epic, pursuant to N.C. Gen. Stat. § 66-154(b), to recover actual damages measured by Epic's economic loss, or Defendant's unjust enrichment caused by the misappropriation, whichever is greater.

83.     As a result of Defendant's wrongful acts, Epic has suffered and is continuing to suffer irreparable injury.  Epic cannot be adequately compensated for these injuries by monetary awards alone, and has no adequate remedy at law for Defendant's misappropriation of Epic's trade secrets. Thus, Epic is entitled to injunctive relief to prevent any future disclosure of its trade secrets under N.C. Gen. Stat. § 66-154(a).

84.     Epic is also entitled to an award of punitive damages under N.C. Gen. Stat. § 66-154(c) and § 1D-15 because Defendant's disclosure of Epic's Trade Secrets to DiMarco was willful and malicious, egregious, and wrongful. Defendant knew that Epic's Trade Secrets were protected trade secrets, which were the sole property of Epic, and which Defendant had expressly agreed not to disclose. But he did so anyway with conscious and intentional disregard for, and indifference to, Epic's rights, knowing that the disclosure was reasonably likely to result in damage to Epic.

85.     For the same reasons, Epic is entitled to an award of attorneys' fees under N.C. Gen. Stat. § 66-154(d).

## THIRD CLAIM FOR RELIEF
### (Misappropriation of Trade Secrets under 18 U.S.C. § 1836, *et seq.*)

86.     Epic re-alleges and incorporates fully by reference the allegations in paragraphs 1 through 85 of this complaint, as if set forth fully herein.

87.     This is a claim for misappropriation of trade secrets under the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1836, *et seq*.

88.     Epic is the owner of Epic's Trade Secrets (as defined above), which are "trade secrets" under 18 U.S.C. § 1839(3) because they are business and technical information that:

> a.   at all relevant times has been the subject of reasonable measures to keep it secret; and
>
> b.   derives independent economic value, actual or potential, from not being generally known or readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information.

89.     Epic's Trade Secrets are intended to be used in, and some have been used in, interstate and foreign commerce as part of Fortnite.

90.     Epic has invested considerable time, effort, and financial resources to develop and protect Epic's Trade Secrets. Epic has treated Epic's Trade Secrets as secret and has protected them from unauthorized access by third parties. Epic's Trade Secrets give Epic an advantage over its competitors.

91.     As described in detail above, at all relevant times, Epic has taken reasonable measures to keep Epic's Trade Secrets secret.

92.     Defendant had access to and acquired Epic's Trade Secrets and other Confidential Information during his time at Epic under the terms and restrictions of the NDA.

93.     Defendant acquired Epic's Trade Secrets with knowledge that they are secrets he was contractually obligated not to disclose.

94.     Defendant misappropriated Epic's Trade Secrets by disclosing them to DiMarco without the express or implied consent of Epic and conspiring with DiMarco to replicate, transmit, communicate, and convey them to others.

95.     As a result of this misappropriation, Defendant has proximately caused harm to Epic and is in a position to continue to injure Epic.

96.     Epic has incurred actual losses and/or Defendant has been unjustly enriched as a result of Defendant's misappropriation of Epic's Trade Secrets.

97.     To the extent Epic's injuries are compensable, Epic is entitled to (i) an award of its damages for actual loss caused by Defendant's misappropriation of Epic's Trade Secrets and (ii) for any unjust enrichment caused by Defendant's misappropriation of Epic's Trade Secrets that is not addressed in computing damages for actual loss, or, (iii) in lieu of damages measured by any other methods, the damages caused by Defendant's misappropriation measured by imposition of liability for a reasonable royalty for Defendant's unauthorized disclosure or use of Epic's Trade Secrets under 18 U.S.C. § 1836(b)(3)(B).

98.     As a result of Defendant's wrongful acts alleged herein, Epic has suffered and is continuing to suffer irreparable injury.  Epic cannot be adequately compensated for these injuries by monetary awards alone, and Epic has no adequate remedy at law for Defendant's misappropriation of Epic's trade secrets. Epic is entitled to injunctive relief against Defendant, who should be preliminarily and permanently enjoined from using or further disclosing or using Epic's Trade Secrets pursuant to 18 U.S.C. § 1836(b)(3)(A).

PPAB 4242533v1

99.     Because Defendant's misappropriation of Epic's Trade Secrets was willful and malicious, Epic is entitled to exemplary damages under 18 U.S.C. § 1836(b)(3)(C) and, should Epic prevail in this matter, reasonable attorney's fees under 18 U.S.C. § 1836(b)(3)(D).

## FOURTH CLAIM FOR RELIEF
### (Civil Conspiracy)

100.    Epic re-alleges and incorporates fully by reference the allegations in paragraphs 1 through 99 of this complaint, as if set forth fully herein.

101.    Upon information and belief, Defendant agreed to share Epic's Trade Secrets and Confidential Information with DiMarco.

102.    Upon information and belief, Defendant and DiMarco agreed that DiMarco would post spoilers about Season 4 and Season 5 of Fortnite based on Defendant's disclosure of Epic's Trade Secrets and Confidential Information to DiMarco.

103.    Defendant's disclosure of Epic's Trade Secrets and Confidential Information was in violation of Defendant's NDA and federal and state trade secret laws.

104.    As a direct result of Defendant's and DiMarco's conspiracy to publicly disclose Epic's Trade Secrets and Confidential Information, Epic has been, and will continue to be, injured and is entitled to injunctive relief, compensatory damages, attorneys' fees, costs, and/or other equitable relief against Defendant.

## PRAYER FOR RELIEF

WHEREFORE, based upon the foregoing, Epic respectfully requests that the Court:

1.      Enter judgment in Epic's favor and against Defendant on all Plaintiff's claims;

2.      Find that Defendant breached the NDA;

3.      Find that Defendant misappropriated Epic's Trade Secrets under N.C.

Gen. Stat. § 66-152, *et seq.*;

4.  Find that Defendant misappropriated Epic's Trade Secrets under 18 U.S.C. § 1836, *et seq.*;

5.  Find that Defendant unlawfully conspired with DiMarco to disclose Epic's Trade Secrets and Confidential Information;

6.  Find that Defendant's conduct was willful, malicious, egregious, and wrongful;

7.  Enter an order that preliminarily and permanently enjoins Defendant from disclosing or using any more of Epic's Trade Secrets and Confidential Information;

8.  Enter an order requiring that Defendant pay Epic a sum certain reflecting the maximum amount of damages permitted under N.C. Gen. Stat. § 66-152, *et seq.* and/or 18 U.S.C. § 1836, *et seq.*;

9.  Enter an order that awards Epic its attorneys' fees, costs, and expenses under N.C. Gen. Stat. § 66-154(d) and/or 18 U.S.C. § 1836(b)(3)(D);

10. Enter an order awarding Epic punitive damages under N.C. Gen. Stat. § 66-154(c) and N.C. Gen. Stat. § 1D-15; and

11. Award Epic such other and further relief as the Court deems just and proper.

[*Signature block on following page.*]

This the 7th day of May, 2018.

**PARKER POE ADAMS & BERNSTEIN LLP**


/s/Christopher M. Thomas
Christopher M. Thomas
N.C. Bar No. 31834
christhomas@parkerpoe.com
Catherine R.L. Lawson
N.C. Bar No. 44574
catherinelawson@parkerpoe.com
PNC Plaza
301 Fayetteville Street, Suite 1400 (27601)
P.O. Box 389
Raleigh, North Carolina 27602-0389
Telephone: (919) 828-0564
Facsimile: (919) 834-4564

*Attorneys for Plaintiff*

PPAB 4242533v1